STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-00-124
JLH-CUM-7/00/2001

Jul 20  3 33 FH '01

SUN NEAK,

      Plaintiff

   v.

                              DECISION AND JUDGMENT

CASCADE CONSTRUCTION, INC.,

      Defendant

This matter is before the court on the complaint of the plaintiff against the defendant Cascade Construction, Inc. ("Cascade") alleging its vicarious liability for the conduct of an employee (Count I) and negligence (Count II).

## I. BACKGROUND

The plaintiff was born in Cambodia and is 46 years old. He came to the United States in 1984 and became a U.S. citizen in 1994. He has worked in the construction industry for many years and during that period has operated many types of power tools, including circular saws.[1] In 1994, he began to work for Dirigo Drywall Associates ("Dirigo").

In late 1996, Dearborn Construction ("Dearborn") was the general contractor of a project to construct a convenience store/gas station in

---

[1]During the trial, this type of saw was synonymously referred to as a circular saw or a skill saw.

1

Sanford, Maine. Cascade was a subcontractor and its employee, John Brockington, was the project manager. Cascade subcontracted some of its work to Dirigo and supervised the work performance of Dirigo's employees.

On December 12, 1996 at approximately 6:30 a.m., the plaintiff and other Dirigo employees arrived at the Sanford job site to begin work. Two Cascade employees, Neil Stewart and Phil Stewart, were also working there. Neil Stewart was Cascade's on-site supervisor. Phil Stewart was a carpenter.

Later that afternoon, Phil Stewart was cutting wet pieces of wood with a hand held circular saw. The saw was equipped with a metal guard that surrounded the bottom half of the round blade. The guard was a safety devise designed to roll back or retract into the upper part of the saw body and expose the lower half of the blade as the saw was pushed forward over the piece of wood being cut. When the cut was complete and the saw was lifted away from the lumber, the guard was supposed to snap back or return to its original position over the bottom half of the blade.

Phil Stewart had set up a work area inside the building because it was raining outside. He made a "work bench" by placing a ten or twelve inch wide wood plank on two saw horses. The work bench was about eight feet away from the street-side exterior wall of the building. Although some scrap materials may have been placed in the area directly between the bench and the exterior walk, it was fairly open and unobstructed. Stewart stood on the street-side of the bench facing away from the exterior wall.

On the opposite side of Stewart's work table toward the interior of the building was a horizontal pile of sheetrock against which leaned a vertical

2

stack of sheetrock (collectively, "First Sheetrock Pile"). There was no room for a person to pass between Stewart's bench or this pile. Beyond the First Sheetrock Pile farther into the building was a walk-in cooler. Although there was enough room for a person to walk between the First Sheetrock Pile and the cooler, the way was impeded somewhat by one or more piles of building material.

Another pile of sheetrock ("Second Sheetrock Pile") was on the floor to the left and slightly to the rear of Stewart's work position at the bench. A person could walk between Stewart and the Second Sheetrock Pile, but would have to pass close to Stewart for a short distance before entering the more open area directly behind him.

At approximately 2:00 p.m., the plaintiff and a co-worker, Chris Harmon, left their work in the bathroom area located in the right rear of the building to retrieve a piece of sheetrock from the Second Sheetrock Pile near Phil Stewart. The plaintiff believed that Harmon was going to get a heavy 4' by 8' sheet and would need help carrying it. The two men walked in front of Stewart's work area passing between the First Sheetrock Pile and the walk-in cooler. This route required them to step over the material on the floor.

When they reached the Second Sheetrock Pile, Harmon cut a piece of sheetrock in half and carried the 4' by 4' piece without assistance from the plaintiff. Rather than using the same route to return to the bathroom area, Harmon passed behind Phil Stewart who was in the process of cutting wood with the circular saw. The plaintiff followed approximately three feet

behind Harmon.

Because of the proximity of the Second Sheetrock Pile to Stewart, Harmon and the plaintiff passed close to Stewart as they proceeded from Stewart's left and walked behind him. Harmon went by him without incident. However, as the plaintiff passed behind Stewart three things happened in quick progression: first, Stewart completed a cut with the saw and the saw's blade guard, clogged with wet sawdust, remained stuck in the open position exposing the rotating blade; second, as Stewart bent forward and downward to examine the cut he had just made, his right arm and hand which held the saw extended out behind him past the "six o' clock" position; and, third, as the plaintiff walked by, his left hand and the saw met severing his "pinky" finger and the adjoining knuckle area and severely cutting his ring finger.

The plaintiff was taken to the hospital by ambulance and underwent surgery. His little finger could not be reattached or saved. He was able to keep his ring finger but is left without the full use of it. Following the plaintiff's release from the hospital he was put on a regimen of medication to relieve or reduce his pain. The medication affected his stomach and prevented him from sleeping. As a result, he went to Brighton Medical Center about ten days later to deal with the problem. The plaintiff also experienced depression as a result of his injury and was treated by a psychologist.

The injury has also affected the defendant in other ways. The nature of the injury constitutes a significant stigma within the defendant's

4

Cambodian culture and his Buddhist religion because a person who has only nine digits on his hands is regarded as having a mark of the devil. Musically, he has lost the ability to play the "Tror-Sor", a two-stringed instrument that requires the use and dexterity of all of the fingers of his left hand on the strings while his right hand draws a bow across the strings. At home with his family, he has gone from a happy, patient man who was helpful around the house to a man who is often sad, embarrassed by his disfigurement, prone to losing his temper and not helpful in the home.

The parties have stipulated that the plaintiff's medical expenses in this matter are $10,000 and his lost wages are $3,000. The court finds that these expenses and losses are all accident-related. The court further finds that the plaintiff has suffered a 10% permanent impairment to his upper extremity, which is the equivalent of a 5% permanent impairment to his whole person, and, based upon the stipulation of the parties, that his life expectancy is 28 years. Having in mind these expenses and losses, the nature and permanence of the plaintiff's injuries, his pain and suffering, and the impact on his life, the court concludes that his total damages are $210,000.

## II. DISCUSSION

The defendant had supervisory control over and responsibility for the condition of the job site and breached its duty to assure that the premises were safe for those who were lawfully there. The defendant failed to maintain the premises in a safe condition by virtue of the location of Phil Stewart's work area and its relation to the various piles of sheetrock and

5

other materials. It was not unreasonable to expect that workers on the job site would pass between Stewart and the Second Sheetrock Pile. There were no visible signs or devises to warn of the danger in Stewart's work area or temporary barriers to assure that the flow of foot traffic was directed away from that zone of danger.[2] The court finds that this breach by the defendant was a contributing and proximate cause of the accident and injuries to the plaintiff.

The defendant also had supervisory control over and responsibility for the conduct of its employees, including Phil Stewart, and breached its duty to train and instruct Stewart on appropriate safety procedures for the safe operation of the circular saw. He was not instructed or trained by Cascade that he should check the operation of the saw's blade guard before cutting the wood to make sure that it was working properly and, in fact, he did not check it immediately before the accident. The safety instructions in the saw's operator's manual included a provision that the blade guard should be checked "before each cut". Plaintiff's Exhibit 32 at p. 2, ¶ 4.[3] This was a

---

[2]The testimony suggests that such measures are never take at a construction site to warn of or divert others away from an area where a circular saw is in operation. It was also suggested that the erection of a makeshift workbench by Stewart with a barrier to the front is an uncommon precaution. If the danger inherent in this practice in a populated work environment is an accepted risk in the construction industry, then it seems to be an unreasonable one. In this case, it would have taken little time or effort for Stewart to have placed an object such as a saw horse directly behind him or to have set up his work station between the First Sheetrock Pile and the walk-in cooler. In either circumstance, another person could not pass close enough to the front or rear of him to come into contact with the saw.

[3]This was the language of the saw manufacturer's manual in effect on December 12, 1996. The current version of the manual provides that the guard should be checked "before each use". Plaintiff's Exhibit 43 at ¶4.

particularly important safety procedure under the circumstances of this case because the wood being cut by Stewart was wet. This tended to cause the saw dust produced by the cut to form into sticky clumps that could clog the track of the blade guard and impede or prevent the retracting operation of the guard. Stewart knew this. In addition, there is no evidence that Stewart checked for the presence of anyone near him immediately before his operation of the saw. The court finds that this breach was a contributing and proximate cause of the accident and injuries to the plaintiff.

The court also finds that the plaintiff was negligent and that his negligence was also a contributing proximate cause of the accident and his injuries. He had been trained by his employer to "stay clear" of power tools operated by other workers on a job site. He was familiar with the operation of circular saws and the dangers inherent in their operation.[4] Although there were no visible warning signs around Stewart's work area, the saw made a significant amount of noise while being operated providing a loud audible warning. When the plaintiff realized that he did not have to help Harmon carry the sheetrock, he could have returned to the bathroom work area via the route that he originally used forward of Stewart's work table.

Evaluating and comparing the parties' respective negligence in this matter, the court concludes that the negligence of the defendant was greater than that of the plaintiff.

---

[4]However, the plaintiff's familiarity with the saw could also cause him to reasonably expect that a properly functioning blade guard minimized the danger to persons passing to the rear of a person properly operating the saw.

## III. DECISION

Based upon the foregoing, the entry is Judgment for the plaintiff in the amount of $168,000, together with lawful interest and costs.

Pursuant to Rule 79(a) M.R.Civ.P., the Clerk is directed to enter this Decision and Order on the Civil Docket by a notation incorporating it by reference.

Dated: July 20, 2001

_____
Justice, Superior Court

Date Filed __02-17-00__ __CUMBERLAND__ Docket No. __CV 00-124__

County

Action __PERSONAL INJURY__

SUN NEAK

CASCADE CONSTRUCTION, INC.

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| WILLIAM H. CHILDS, ESQ 773-0275 | JOHN S. WHITMAN ESQ 774-7474 |
| 257 DEERING AVE, PORTLAND ME 04103 | PO BOX 9545, PORTLAND ME 04112-9545 |

| Date of Entry | |
|---|---|
| 2000 | |
| Feb. 22 | Received 02-17-00: |
| | Complaint Summary Sheet filed. |
| "   " | Complaint filed. |
| "   " | Summons filed showing officer's return of service on 02-03-00 upon Cascade Contruction, Inc. to David Currier, Esq. |
| "   " | Defendant's Notification of Discovery Filed. |
| | First Set of Interrogatories to Plaintiff and First Request for Production of Documents by Plaintiff served on William H. Childs, Esq. on 02-15-00. |
| Feb. 23 | Received 02-22-00: |
| | Defendant's Answer filed. |
| Mar 6 | Received 3-6-00: |
| | Scheduling Order filed. (Warren, J.) |
| | Scheduling Order filed. Discovery deadline is 11-6-00. |
| | On 3-6-00    copy mailed to William Childs and John Whitman, Esqs. |
| Apr. 27 | Received 4-27-00. |
| | Defendant's notification of discovery service filed. |
| | Rule 30(b)(6) Notice of Deposition of Dirigo Drywall served on William H. Childs, Esq. on 4-26-00. |
| June 7 | Received 6-7-00. |
| | Plaintiff's notification of discovery service filed. |
| | Plaintiff's amended answers to defendant's first set of interrogatories served on John S. Whitman Esq. on 6-5-00. |
| June 13 | Received 06-12-00. |
| | Plaintiff's Notification of Discovery Service filed. |
| | Plaintiff's Interrogatories Propounded to Defendant, Plaintiff's First Request for Production of Documents, and Plaintiff's First Request for Admissions, served on John Whitman, Esq. on 06-08-00. |
| Nov. 16 | Received 11-16-00 |
| | Plaintiff's Notification of Discovery Service with Attached filed. |
| | Plaintiff's Deposition Notice of Dr. Samuel S. Scott Served on |
| | John Whitman on 11-14-00 |